# EXHIBIT 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIMBERLY COPELAND,<br><br>Plaintiff,<br><br>v.<br><br>TWITTER, INC., et al.,<br><br>Defendants. | Case No. 17-cv-05851-WHO<br><br>**ORDER GRANTING MOTION TO DISMISS WITH PREJUDICE**<br><br>Re: Dkt. No. 35 |

Sean and Brodie Copeland were intentionally struck and killed by a truck driven by "ISIS soldier" Mohamed Lahouaiej Bouhlel (Bouhlel) in Nice France in July 2016 (Nice Attack). This case, brought by Kimberly Copeland, the widow of Sean Copeland and mother of Brodie Copeland, alleges that defendants Twitter, Inc., Google LLC, and Facebook, Inc. failed to prevent foreign terrorist organizations and specially designated global terrorist groups from using their social media platforms. Broadly, Copeland argues that defendants' social media platforms played an essential role in the rise of ISIS. Narrowly, her First Amended Complaint (FAC) alleges that defendants' social media sites and tools provided material support, resources, and services to ISIS and that those actions led to the deaths of

The theories of direct liability under the Antiterrorism Act (ATA) asserted by Copeland are precluded by the Ninth Circuit's decision in *Fields v. Twitter, Inc.*, 881 F.3d 739 (9th Cir. 2018), affirming my order dismissing that case. Following *Fields*, materially similar direct liability claims have been rejected by numerous judges in this District and elsewhere. *See Taamneh v. Twitter, Inc.*, No. 17-CV-04107-EMC, 2018 WL 5729232 (N.D. Cal. Oct. 29, 2018); *Cain v. Twitter Inc.*, No. 17-CV-02506-JD, 2018 WL 4657275 (N.D. Cal. Sept. 24, 2018); *Gonzalez v. Google, Inc.*, 16-CV-03282-DMR, 2018 WL 3872781 (N.D. Cal. Aug. 15, 2018) (*Gonzalez II*); *Gonzalez v. Google, Inc.*, 282 F. Supp. 3d 1150 (N.D. Cal. Oct. 23, 2017) (*Gonzalez I*); *Pennie v.*

*Twitter, Inc.*, 281 F. Supp. 3d 874 (N.D. Cal. Dec. 4, 2017); *see also Crosby v. Twitter, Inc.*, 303 F. Supp. 3d 564 (E.D. Mich. March 30, 2018). The same courts have also dismissed the indirect liability (aiding and abetting) claims after specifically considered the Justice Against Sponsors of Terrorism Act (JASTA) amendments to the ATA. *Cf. Siegel v. HSBC Bank USA, N.A.*, No. 17CV6593 (DLC), 2018 WL 3611967, at *5 (S.D.N.Y. July 27, 2018) (dismissing indirect, aiding and abetting claims against a bank who services were used by terrorists).

The allegations here are materially similar to those alleged in the cases identified above (if not weaker in terms of the alleged connections between specific terrorist acts and terrorists and defendants' social media platforms). I will follow *Fields* and apply the "direct" proximate cause standard under the ATA for direct liability. Under that standard, the allegations in the FAC cannot support proximate cause as a matter of law. I also agree with and follow the analyses of the courts identified above with respect to JASTA and aiding and abetting liability--the allegations in the FAC do not support aiding and abetting liability as a matter of law. Finally, the state law tort claims fail for a similar failure to allege facts supporting proximate cause. Because Copeland's counsel was not able to identify facts that could be asserted to get around these adverse decisions, the motion to dismiss is GRANTED and plaintiff's claims are DISMISSED WITH PREJUDICE.

**BACKGROUND**

**I.     FACTUAL BACKGROUND**

The FAC details in depth the legislative history behind the passage of the Antiterrorism Act (ATA) in 1992 and its amendment following the September 11, 2001 attacks as well as its amendment in September 2015 as part of the Justice Against Sponsors of Terrorism Act (JASTA). FAC ¶¶ 1-7; 42-90. The FAC also discusses the rise of ISIS, its designation as a Foreign Terrorist Organization (FTO) and "specially designated global terrorist" (SDGT) group, and ISIS's use of defendants' social media platforms. *Id*. ¶¶ 11- 32; 91-172. In general, Copeland alleges that defendants "knowingly and recklessly provided the terrorist group ISIS with accounts to use its social networks as a tool for spreading extremist propaganda, raising funds, and attracting new recruits." *Id*. ¶¶ 12, 26, 27, 455. She alleges generally how ISIS uses defendants' platforms to recruit new members, fundraise, and "spread its terror propaganda." FAC ¶¶ 162-345, 352-358,

393-397, 458-459, 462-466. She identifies many thousands of Twitter accounts used by ISIS, with many thousands of followers, as well as alleged accounts on the other services. *Id*. ¶¶ 14-17, 456. She asserts that defendants profit from allowing ISIS to use their services, through ads placed on ISIS posts. *Id*. ¶¶ 448-450, 473-496. She contends that because ISIS content is shown on defendants' sites with "configured" ads provided by defendants, defendants are "content providers." *Id*. ¶¶ 497-501.

Copeland alleges that prior to the Nice Attack, defendants had notice of ISIS's use of their platforms but "refused to actively monitor" those accounts and knowingly permitted ISIS to use their services, despite being able to identify and then deny services to ISIS-related users through content-neutral algorithms and methods to detect "suspicious" activity. *Id*. ¶¶ 459; 513-537. When defendants received complaints about ISIS's use of their platforms, they determined that such use did not violate their terms of service and/or allowed ISIS's use to continue when it did violate those terms of service. *Id*. ¶ 460. Even where defendants blocked some ISIS-related accounts, they did not make substantial or sustained efforts to ensure ISIS did not reestablish accounts using new identities. *Id*. ¶ 461.

As relevant to the terrorist attack at issue in this case, Copeland contends that ISIS used defendants' platforms to "specifically threaten France that it would be attacked for participating in a coalition of nations against ISIS, to celebrate smaller attacks leading up to these major attacks, and to transform the operational leader of the Nice attack into a 'celebrity' among jihadi terrorists in the year leading up to the Nice attack via videos featuring his ISIS exploits in Syria, France and Belgium." *Id*. ¶ 24. "ISIS also used Defendants' platforms to celebrate the Nice attack, to intensify the intimidation of the attacks, and to claim credit for the attacks." *Id*. ¶ 25.

Copeland asssserts that "ISIS carried out a horrific terror attack in Nice, France, murdering 86 people, including Sean and Brodie Copeland." *Id*. ¶ 346. The purpose of Nice Attack was "a) to intimidate and coerce the civilian populations of France, the United States, and other countries engaged in activities against ISIS; b) to influence the policies of these governments by intimidation and coercion; and c) to affect the conduct of these governments by mass destruction, assassination, and kidnapping." *Id*. ¶ 347. A "major component of the Nice Attack was the

3

messaging disseminated by ISIS prior to, during, and after the events, in which ISIS stated its reasons for committing the terrorist attack against these countries' civilians." *Id*. ¶ 348. "The Nice Attack involved extensive planning, recruiting, organization, training, preparation, coordination, and funding," and "involved the use of Defendants' platforms, before and after the attack, to intensify the fear and intimidation that ISIS intended to inflict by this mass casualty attack." *Id*. ¶¶ 349-350.

Copeland states that a month before the Nice Attack, the International Center for the Study of Violent Extremism (ICSVE) obtained a "sophisticated and disturbing" video produced by ISIS "urging followers to use a truck loaded with explosives to attack crowds. The video warns that ISIS can no longer wait for western soldiers to attack them, with one scene depicting an ISIS 'soldier' preparing to run over civilians with an SUV." *Id*. ¶ 359. ISIS produced other forms of media also encouraging the use of vehicles as weapons. *Id*. ¶¶ 360-366.

Relying on a CNN news article, Copeland alleges that the "Nice Attack involved communication and coordination between attacker Mohamed Lahouaiej Bouhlel and ISIS, as ISIS 'radicalized (Bouhlel) very quickly.'" *Id*. ¶ 367. She also asserts, relying in a Guardian news article, that "[a]uthorities believe Bouhlel carefully plotted and planned his attack for up to a year with accomplices and ISIS operatives." *Id*. ¶ 368. "Investigations in Bouhlel's life revealed a history of ISIS-related internet searches and communications with accomplices via cell phones and Defendants' services." *Id*. ¶ 373. Again, relying on a news article from the Guardian, she alleges that in January 2015, following the Charlie Hedbo terrorist attacks in which 12 people died, "Bouhlel sent a text message to an accomplice that read, 'I am not Charlie. I'm happy they have brought some of Allah's soldiers to finish the job.'" *Id*. ¶ 374.

On April 4, 2016, an accomplice "sent Bouhlel a Facebook message that read, 'Load the truck with 2,000 tonnes of iron... release the brakes my friend and I will watch.'" *Id*. ¶ 376. Starting in April 2016, plaintiff states that Bouhlel began searching the internet for topics regarding ISIS, "radical Islam" violence, and "jihadist propaganda" chants. *Id*. ¶¶ 378-383.

On July 4, 2016, Bouhlel reserved a "heavy" truck for the week of France's Bastille Day celebrations. *Id*. ¶¶ 384-385. Bouhlel picked up the truck on July 11, 2016, and took photographs

4

of himself and two accomplices with it, and over the next few days drove the truck around the promenade in Nice. *Id*. ¶¶ 389-392.

On July 14, 2016, Bouhlel drove to the promenade and just before the attack, sent "two 'odious messages' that had been pre-recorded on his mobile phone. These messages are frequently used by ISIS, both for the operative to declare allegiance to ISIS, as well as for ISIS to use as propaganda and glorify the attacker." *Id*. ¶ 416. Around 10:30 p.m. Bouhlel carried out his attack, using the truck to intentionally hit and kill people gathered for the Bastille Day celebrations on the promenade. *Id*. ¶¶ 417-421. The truck came to a stop and Bouhlel began shooting through the windows of the truck and screaming Allahu Akbar. *Id*. ¶¶ 422-423. Bouhlel was eventually killed by police near where the truck had come to a stop. *Id*. ¶ 425.

Two days after the attack, ISIS "issued a statement claiming responsibility, describing Bouhlel as a 'soldier of the Islamic State.'" *Id*. ¶¶ 427-429. ISIS, through its radio station and publications, continued to claim credit for the attack and that Bouhlel was a "soldier of the Islamic State." *Id*. ¶¶ 430-433, 439. Copeland relies on the statements of French Interior Minister Bernard Cazeneuve that this attack "'is a new type of attack. We are now confronted with individuals that are sensitive to the message of ISIS and are committed to extremely violent actions without necessarily being trained by them. Cazeneuve went on to explain, 'We are now facing individuals who are responding positively to the messages issued by the Islamic State without having had any special training and without having access to weapons that allow them to commit mass murder.'" *Id*. ¶¶ 434-435. And French Defense Minister commented, "[c]learly, certain individuals, such as the driver of that truck, individually responded to this call for committing murder. Even if Daesh doesn't do the organizing, Daesh inspires a terrorist spirit." *Id*. ¶ 440.

Because Bouhlel was radicalized in part through social media from defendants' platforms, plaintiff alleges that the Nice Attack was an act of "international terrorism" under the criminal laws of the United States. *Id*. ¶¶ 540-548.

## II. PROCEDURAL BACKGROUND

This case was initially filed in October 2017. In December 2017, the parties stipulated to

5

1  stay this case pending the Ninth Circuit's resolution of the appeal of my decisions dismissing a
2  similar complaint (alleging violations of the ATA by social media defendants in connection with
3  acts of international terrorism) in *Fields v. Twitter*, N.D.C.A. Case No. 16-cv-0213 WHO. The
4  Ninth Circuit issued its opinion affirming my decisions in *Fields* on January 31, 2018.

5  Copeland filed a First Amended Complaint (FAC) on June 18, 2018. The FAC alleges the
6  following causes of action: (1) Liability For Aiding And Abetting Acts of International Terrorism
7  Pursuant to 18 U.S.C. § 2333(a) and (d); (2) Liability For Conspiring in Furtherance of Acts of
8  International Terrorism Pursuant to 18 U.S.C. § 2333(a) and (d); (3) Provision of Material Support
9  to Terrorists in Violation of 18 U.S.C. § 2339A and 18 U.S.C. § 2333; (4) Provision of Material
10 Support and Resources to a Designated Foreign Terrorist Organization in Violation of 18 U.S.C. §
11 2339B(a)(1) and 18 U.S.C. § 2333(a); (5) Negligent Infliction of Emotional Distress; (6)
12 Concealment of Material Support and Resources to a Designated Foreign Terrorist Organization in
13 Violation of 18 U.S.C. § 2339C(c) and 18 U.S.C. § 2333(a); (7) Provision of Funds, Goods, or
14 Services to or for the Benefit of Specially Designated Global Terrorists in Violation of Executive
15 Order No. 13224, 31 C.F.R. Part 594, 50 U.S.C. § 1705, and 18 U.S.C. § 2333(a); and (8)
16 Wrongful Death. Defendants move to dismiss.

**LEGAL STANDARD**

**I.     MOTION TO DISMISS**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." Id. While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the

6

Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

## II.  U.S. ANTITERRORISM ACT (ATA) & JUSTICE AGAINST SPONSORS OF TERRORISM ACT (JASTA)

The civil remedies section of the ATA allows any United States national "injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs," to sue in federal court and recover treble damages and attorney's fees. 18 U.S.C. § 2333(a).[1] The ATA also contains criminal provisions, the violation of which can provide the basis for a cause of action under § 2333(a). Based on the allegations here, the relevant provisions invoked by Copeland are: (i) 18 U.S.C. § 2339A, prohibiting the provision of "material support or resources" by anyone "knowing or intending that they are to be used in preparation for, or in carrying out" any of several enumerated crimes; (ii) § 2339B, prohibiting the "knowing" provision of "material support or resources to a foreign terrorist organization"; and (iii) 2339C(c), prohibiting "knowing concealment" by persons and entities in the United States or U.S. nationals of the "nature, location, source, ownership, or control of any material support or resources, or any funds or proceeds of such funds" "knowing or intending" that the support or resources are to be provided or collected in violation of § 2339B or with "the intention that such funds be used, or with the knowledge that such funds are to be used" in order to carry out an act of international terrorism.

---

[1] ATA defines an act of "international terrorism" as "activities that – (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State; (B) appear to be intended – (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum." 18 U.S.C. § 2331(1).

Under 18 U.SC. § 2333(d), that "liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed [] an act of international terrorism."[2] Section 2333(d) was added to the ATA by Congress in September 2016 under the Justice Against Sponsors of Terrorism Act (JASTA) to provide "secondary liability" for persons and entities who did not, themselves, carry out the acts of international terrorism but still knowingly provided material support for the terrorist organizations and acts of terrorism.

JASTA's statement of purpose explains:

> The purpose of this Act is to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.

JASTA § 2(b).

## DISCUSSION

### I. DIRECT LIABILITY UNDER ATA

Defendants argue that under the Ninth Circuit's *Fields* opinion Copeland's allegations do not and cannot plausibly allege proximate cause as required to state a claim under § 2333(a) because they cannot allege a direct relationship between defendants' services and the Nice Attack. In *Fields*, the Ninth Circuit affirmed my decision dismissing a similar claim asserted under the ATA for lack of proximate cause. The panel explained that proximate cause under the ATA required a "direct relationship" between the defendant's conduct and the injury, and that Fields failed to plead that direct relationship based on "Twitter's provision of communication equipment to ISIS, in the form of Twitter accounts and direct messaging services." *Fields*, 881 F.3d at 749. The Ninth Circuit noted that because Fields pleaded "no facts indicating that Abu Zaid's attack was in any way impacted, helped by, or the result of ISIS's presence on the social network," Fields could not state her claim. *Id.* at 750.

---

[2] Plaintiff also alleges that defendants provided funds, good, or services for the benefit of specially designated global terrorist (SDGT) groups in violation of Executive Order No. 13224 (31C.F.R. Part 594), 50 U.S.C. § 1705, 18 U.S.C. § 2333(a).

8

Copeland argues, first, that *Fields* was wrongly decided by the Ninth Circuit (citing to out-of-circuit cases adopting different causation standards) and, second, that *Fields* did not address JASTA, which fundamentally altered the landscape. On the first argument, I will follow the binding precedent of *Fields* and the "direct" proximate cause standard. On the second argument, I agree with the numerous decisions that have concluded that JASTA did not address or undermine *Fields's* conclusion regarding the proximate cause required for direct liability. Instead, JASTA simply added a new cause of action under § 2333(d) for aiding and abetting *secondary* liability. *See, e.g., Gonzalez v. Google, Inc.*, 16-CV-03282-DMR, 2018 WL 3872781, at *1 (N.D. Cal. Aug. 15, 2018) (*Gonzalez II*); *Gonzalez v. Google, Inc.*, 282 F. Supp. 3d 1150 (N.D. Cal. October 23, 2017) (*Gonzalez I*); *Crosby v. Twitter, Inc.*, 303 F. Supp. 3d 564 (E.D. Mich. March 30, 2018); *Force v. Facebook, Inc.*, 304 F. Supp. 3d 315 (E.D.N.Y. January 18, 2018).

More narrowly, Copeland asserts that in *Fields* the Ninth Circuit noted that:

> the allegations in the SAC do not support a plausible inference of proximate causation between Twitter's provision of accounts to ISIS and the deaths of Fields and Creach. Plaintiffs allege no connection between the shooter, Abu Zaid, and Twitter. There are no facts indicating that Abu Zaid's attack was in any way impacted, helped by, or the result of ISI's presence on the social network.

*Fields*, 881 F.3d at 750. She claims that she made those allegations here. That is not true. As in *Fields*, there are no facts that ISIS communicated to Bouhlel or that Bouhlel expressed any connection to ISIS prior to the attack through any medium, must less use of defendants' platforms. Further, while she identifies ISIS materials that were viewed by Bouhlel prior to the attack, none of those materials were allegedly seen or hosted on *defendants'* platforms. For example, she does not allege that the calls by ISIS to use vehicles in attacks, much less attacks in France, were present on any of defendants' platforms. The *only* specific allegation regarding Bouhlel's use of defendants' services is that an accomplice sent him a message through Facebook to encourage the attack. FAC ¶ 376. But that is not an alleged communication from ISIS to Bouhlel. Nor is there any evidence that Facebook both knew of that one message and failed to remove or otherwise act on it.

The general allegations that Bouhlel was "radicalized" because of the ISIS content on

9

defendants' sites are no different from the allegations made and rejected by the Ninth Circuit in *Fields*, and in *Gonzalez II*, *Pennie*, *Crosby*. A direct connection has not been alleged to plausibly plead proximate cause between ISIS's use of defendants' platforms and the Nice Attack.[3] Plaintiff's direct liability claims under § 2333(a) are DISMISSED with prejudice.

## II. SECONDARY LIABILITY

Plaintiff argues that liability has nonetheless been adequately alleged under Section 2333(d) for aiding and abetting.[4] Defendants disagree because Section 2333(d) requires provision of assistance to the person, here Bouhlel, and not ISIS in general. No allegations have been or could be pleaded to show that. Materially similar claims to plaintiff's failed in part for the same reason in *Taamneh*, 2018 WL 5729232, at *10 and *Crosby*, 303 F. Supp. 3d at 574.

Even if Copeland only needed to allege facts showing that defendants aided and abetted ISIS or ISIS terrorist attacks in general, there are no plausible allegations that *this* attack was

---

[3] As to the underlying ATA criminal acts, Copeland did not oppose dismissal of her Third Cause of Action (§ 2339A [provision of "material support or resources" by anyone "knowing or intending that they are to be used in preparation for, or in carrying out" terrorism]) or her Sixth Cause of Action (§ 2339C(c) ["knowing concealment" by persons and entities in the United States or U.S. nationals of the "nature, location, source, ownership, or control of any material support or resources, or any funds or proceeds of such funds"]). She opposed dismissal of her Fourth Cause of Action under § 2339B (providing "knowingly" provided "material support"). However, because I find that proximate cause has not and, given the discussion at the hearing on this motion, cannot be plausibly pleaded under the ATA for direct liability, I do not need to reach whether for purposes of direct liability plaintiff has also adequately alleged violation of § 2339B. If I did reach the issue, I would reject it for the same reasons as the materially relevant allegations in were rejected in *Crosby v. Twitter, Inc.*, 303 F. Supp. 3d 564, 576-77 (E.D. Mich. 2018) ("Because the defendants must 'knowingly' provide support with some discernible apprehension that it could be used to facilitate terrorism, the failure to allege facts to show knowledge of a foreseeable connection to terrorist acts is fatal to the material support claims, particularly where the only allegations of the amended complaint are that the defendants provided 'routine' services knowing only generally that some (unidentified) users could be affiliated with terrorism." (relying on *Hussein v. Dahabshiil Transfer Services Ltd.*, 230 F. Supp. 3d 167, 176 (S.D.N.Y. 2017), *aff'd sub nom. Hussein v. Dahabshiil Transfer Services Ltd*, 705 Fed. Appx. 40 (2d Cir. 2017) (unpublished)). This analysis also disposes of her Seventh Cause of Action (International Emergency Economic Powers Act ["IEEPA"], 31 C.F.R. § 594.204(a)), because both sides agree the analysis is the same as for § 2339B.

[4] Defendants note that under this section, liability can attach for "aiding and abetting" or "conspiracy" and that plaintiff pleaded, in her Second Cause of Action, a conspiracy claim under 2333(d). Copeland made no argument in opposition and did not point to allegations regarding conspiracy in the FAC to show that she has adequately alleged a conspiracy claim. Therefore, only aiding and abetting is at issue and her Second Cause of Action is DISMISSED with prejudice.

10

carried out by ISIS. Instead, the facts as alleged show that ISIS took credit *after* the attack. Absent evidence that ISIS itself planned or carried out the attack, facts that ISIS sought to "generally radicalize" individuals and promoted terrorists attacks similar to the one Bouhlel carried out are insufficient. *See Crosby*, 303 F. Supp. 3d 564.

Finally, even if these hurdles could be overcome, the "proper legal framework for how [aiding and abetting] liability should function" under the ATA is as identified in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983); *see Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018); *Taamneh*, 2018 WL 5729232, at *11. Under *Halberstam,* in the civil context, "[a]iding-abetting includes the following elements: (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." *Halberstam*, 705 F.2d at 477.

Copeland has failed to allege the second and third elements. Regarding intent under the second element, the Second Circuit in *Linde* explained that while a plaintiff does not have to show that the defendant knew of the specific attack at issue, she has to show more than just a defendant's knowledge of the foreign terrorist organization's connection to terrorism. *Linde*, 882 F3d at 329-30. The plaintiff must show that the defendant *intended* to further the organization's terrorist activities or at least was "generally aware" that, through its actions, the defendant "was thereby playing a 'role' in [the organization's] violent or life-endangering activities." *Id*. at 329. That means more than just providing material support to such an organization.

Here, there are only allegations that defendants were "generally aware" that their services were used by ISIS, but no allegations that with that knowledge defendants were playing or assuming a role in ISIS's terrorist activities. *See also Taamneh*, 2018 WL 5729232, at *11 ("There is no allegation, for example, that Defendants knew that ISIS members had previously used Defendants' platforms to communicate specific plans to carry out terrorist attacks. Defendants' purported knowledge that ISIS previously recruited, raised funds, or spread propaganda through Defendants' platforms that is more akin to providing material support to a foreign terrorist organization than assuming a role in terrorist activities."); *Cain v. Twitter Inc.*,

11

No. 17-CV-02506-JD, 2018 WL 4657275, at *3 (N.D. Cal. Sept. 24, 2018) (dismissing complaint which did not "allege that Twitter was 'aware' that it was 'assuming a role in' the terrorists' attacks in Europe").

The third element under *Halberstam* requires Copeland to plead facts showing "substantial assistance" on the part of the defendant.

> [F]actors relevant to determining how much encouragement or assistance is substantial enough to satisfy the third element: (1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance

*Linde*, 882 F.3d at 329 (internal citation omitted); *see also id.* at 331 ("aiding and abetting focuses on the relationship between the act of international terrorism and the secondary actor's alleged supportive conduct"). There are numerous failures to allege facts sufficient to support an allegation of substantial assistance: there is no evidence that defendants encouraged terrorist attacks, had advance knowledge of any attacks (much less that they were present), intended ISIS to carry out the attacks, or otherwise manifested a culpable state of mind.[5]

As one more in-depth example, in *Halberstam* the D.C. Circuit indicated that for factor (2), the assistance given by the defendant should play a "major part in prompting the tort" or be "integral" to the tort to be considered substantial assistance. *Halberstam*, 705 F.2d at 484. Here, Copeland fails to allege that defendants played a major or integral part in ISIS's terrorist attacks because there were no allegations that ISIS regularly used defendants' platforms to communicate with its "soldiers" or otherwise in support of its terrorist attacks. *See also Taamneh*, 2018 WL 5729232 at *12; *see also id.* (fourth element not met where defendants only provided routine services generally available to members of the public). Her indirect, aiding and abetting, liability claims under § 2333(d) are DISMISSED with prejudice.

## III. STATE LAW CLAIMS

That leaves Copeland's state law tort claims for negligent infliction of emotional distress

---

[5] Indeed, Copeland's own allegations show that defendants did take steps to "take-down" and otherwise block ISIS's efforts to use its platforms, *see, e.g.*, FAC ¶¶ 416, 519, 523, 535, 537, although she contends defendants could have and should have done more.

12

(Fifth Cause of Action) and wrongful death (Eighth Cause of Action). Those claims also require allegations showing proximate cause between the acts of defendants and the Nice Attack. In *Taamneh*, Judge Chen concluded that even if these state law claim apply a lower, less demanding proximate cause standard than under the ATA, the materially similar allegations in that case failed to support proximate cause because allegations that the terrorist "was radicalized through Defendants' social media networks, that allegation is entirely conclusory in nature and fails to establish proximate cause even under the more lenient standard." *Taamneh v. Twitter, Inc*., No. 17-CV-04107-EMC, 2018 WL 5729232, at *13 (N.D. Cal. Oct. 29, 2018); *see also Crosby v. Twitter, Inc*., 303 F. Supp. 3d 564, 580 (E.D. Mich. 2018) (dismissing state law wrongful death claims for lack of proximate cause).

The same is true here. There are no allegations as to *how* Bouhlel was radicalized through use of use of defendants' services.

## CONCLUSION

The motion to dismiss the FAC is GRANTED. In light of Copeland's failure to identify any facts that she could plead to overcome the decisions from this and other courts who have consistently rejected materially similar claims, the motion to dismiss is GRANTED without leave to amend and her claims are DISMISSED WITH PREJUDICE

**IT IS SO ORDERED.**

Dated: November 29, 2018

William H. Orrick
United States District Judge